# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

————————————

### No. ACM 40810

————————————

### UNITED STATES
*Appellee*

**v.**

### Derrick E. BRADDY
Master Sergeant (E-7), U.S. Air Force, *Appellant*

————————————

Appeal from the United States Air Force Trial Judiciary

Decided 5 June 2026

————————————

*Military Judge*: Thomas A. Smith;[1] Willie J. Babor.

*Sentence*: Sentence adjudged 20 December 2024 by GCM convened at Scott Air Force Base, Illinois. Sentence entered by military judge on 16 January 2025: Dishonorable discharge, confinement for 60 months, and reduction to E-1.

*For Appellant*: Captain John M. Fredericks, USAF (on brief); Brad Simon, Esquire (on brief); Major Trevor N. Ward, USAF; Scott R. Hockenberry, Esquire.

*For Appellee*: Colonel G. Matt Osborn, USAF (on brief); Colonel Matthew D. Talcott (on brief); Mary Ellen Payne, Esquire (on brief); Major Vanessa Bairos, USAF; Major Heather R. Bezold, USAF; Major Jocelyn Q. Wright, USAF.

Before GRUEN, MENDELSON, and KUBLER, *Appellate Military Judges*.

Judge MENDELSON delivered the opinion of the court, in which Senior Judge GRUEN and Judge KUBLER joined.

————————————

[1] Hearing concerning applications for prereferral warrants pursuant to Article 30a, Uniform Code of Military Justice, 10 U.S.C. § 830a.

*United States v. Braddy*, No. ACM 40810

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4.**

———————————————

MENDELSON, Judge:

A general court-martial consisting of a military judge convicted Appellant, contrary to his pleas, of three specifications of sexual abuse of a child in violation of Article 120b, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 920b.[2,3] The military judge sentenced Appellant to a dishonorable discharge, confinement for 60 months, and reduction to the paygrade of E-1. The convening authority took no action on the findings or sentence.

Appellant raises three issues on appeal, which we consolidate and restate as two issues: (1) whether the findings of guilty are factually sufficient; and (2) whether Specification 3 of Charge I is legally sufficient. We find no error and affirm.

## I. BACKGROUND

### A. Convicted Offenses Involving EH (Appellant's Niece)

Appellant's niece, EH, is the victim of Appellant's convicted offenses of sexual abuse of a child. At the time of the offenses, EH was 11 or 12 years old.

While Appellant was stationed at Scott Air Force Base, Illinois, he would frequently see family members, including EH, who resided at the family farm in Piedmont, Missouri, about two-and-a-half hours away. Appellant and his sister JC—EH's mother—would frequently watch each other's children, and the children would spend time at each other's homes. Appellant was considered the "fun uncle" and was particularly close with EH. The other children in the family would tease EH that she was Appellant's "favorite."

———————————————

[2] Unless otherwise noted, references in this opinion to the UCMJ, Rules for Courts-Martial, and Military Rules of Evidence (Mil. R. Evid.) are to the *Manual for Courts-Martial, United States* (2019 ed.).

[3] One specification of Article 120b, UCMJ, was withdrawn and dismissed without prejudice. Appellant was found not guilty of one specification of touching the buttocks of a child, EH, under the age of 16 years with his hand in violation of Article 120b, UCMJ; one specification of unlawfully giving alcohol to a child, EH, under the age of 18 years in violation of Article 134, UCMJ, 10 U.S.C. § 934; and one specification of sexual assault in violation of Article 120, UCMJ, 10 U.S.C. § 920, involving a different charged victim.

2

At trial, EH testified about two separate incidents that happened while staying at Appellant's home.

### 1. First Incident (Specification 1 of Charge I)

The first incident occurred one night in the spring of 2022, when EH was either 11 or 12 years old. On that night, while EH and Appellant were watching a movie, Appellant gave EH different sleep aids so that she would go to bed—first a Melatonin pill, then a Melatonin gummy, and then NyQuil—as he normally would when EH stayed at his house. EH felt "[d]rowsy, really sleepy," and fell asleep on the couch after finishing the movie. The next thing EH remembered was waking up with Appellant's penis in her outstretched hand "moving back and forth." At trial, EH described the feeling of Appellant's penis in her hand "[l]ike a bone with like skin on it." EH tried "not to hold [her] hand in the position that he would put it in" but when her "fingers would fall . . . he would fix [her] fingers" to curl them back together. EH "fluttered [her] eyes" but did not open her eyes because she was "scared . . . [she] was going to get in trouble and [she] didn't know what to do." EH, however, knew it was Appellant because "[h]is hands were like calcified, like dry and he was doing his like usual breathing after he was like done playing the game or like during playing the game because he screams, or when he drinks." The "heavy breathing" did not sound like anyone else and the only other people in the home that night were EH's 13-year-old brother, her 10-year-old male cousin (Appellant's son), and her 14-year-old female cousin (Appellant's daughter). EH did not "say anything" to Appellant because she was "scared" and "figured if [she] would've said something, he would've got mad and then . . . tell [her] mom that [she] did something." EH also did not initially tell anyone what had happened because they "wouldn't have believed [her]." This incident formed the basis for the charge of sexual abuse of a child under the age of 16 years of age "by causing [EH] to touch his penis with her hand, with an intent to gratify his sexual desires" (Specification 1 of Charge I).

After this first incident, EH did not want to go back to Appellant's house but "was scared to tell [Appellant] why [she] didn't want to go up there." EH's mother, JC, testified that she noticed a change in EH's behavior during this timeframe, in that EH no longer wanted to go to Appellant's house and EH "seemed a little reclused." Appellant and EH did, however, exchange numerous text messages following the first incident. Appellant repeatedly urged EH to "go up" to his house. EH repeatedly responded that she did not want to go to Appellant's house, telling him at various points in the text message conversation: "I don't think I want to be going up there as much," "I just don't want to go up there," "I haven't been wanting to go up there for a little while," "What if I just don't want to go up there anymore," and "I don't want to talk tomorrow or ever." Appellant repeatedly probed EH asking why she did not want to come

to his house. After EH avoided answering by saying she did not know why, Appellant messaged that "[n]othing will change about how I feel towards you." Appellant elaborated by messaging: "I can't say you are a favorite. But I do see your struggles and I try to show you that you are loved and you are pretty and you do matter." At a later point, Appellant again texted to EH, "I love you, you are pretty, and you need to know both, I only try to put you first sometimes because you feel you are last a lot of times."

### 2. Second Incident (Specifications 3 and 4 of Charge I)

The second incident happened when EH did eventually go back to Appellant's house during the end of June 2022. On that day, EH was playing on her virtual reality headset when Appellant approached her with a glass of soju.[4] EH recalled that it tasted "[l]ike rubbing alcohol" and "it burnt [her] entire mouth." After drinking the soju from the glass slowly, Appellant asked EH if it would be "easier" if she took a shot. After EH agreed it would be easier, Appellant poured shot glasses and told EH to get off of her virtual reality headset so that it could "just be him and [EH]." Over the course of the next hour-and-a-half to two hours, EH recalled that Appellant poured her anywhere from 6 to 15 shots. EH felt dizzy to the point that she would not have been able to play on her virtual reality headset if she had tried. At one point, Appellant brought out a breathalyzer to test EH. The second time EH used the breathalyzer, Appellant told EH she was at ".06." At that point, Appellant put away the shot glasses and then asked EH to play a game of "truth or dare." At first the game "was pretty normal." But then the game started to make EH uncomfortable. The first time EH felt uncomfortable was when she chose a "dare" and Appellant dared her "to take off your underwear but you can put your shorts back on when you're done taking them off." EH refused to do the dare. Appellant responded, "Oh, okay," with "a deep sigh, breath in, breath out," and appeared disappointed. On Appellant's next turn, he chose a "dare" and EH dared Appellant to spin around in a circle, which he did. Then on EH's next turn, she chose "truth" and Appellant asked, "What is the type of porn you watch?" EH refused to answer. After that, the game "was just back to normal Truth or Dare." Appellant's "dare" and "truth" formed the basis for the charges of sexual abuse of a child under the age of 16 years of age "by daring [EH] to take off her pants and underwear" (Specification 3 of Charge I) and by "intentionally communicating indecent language" to EH by asking her about pornography (Specification 4 of Charge I).

After playing one more round of "truth or dare," EH asked for a glass of water. Appellant left the room to get the glass of water, but EH fell asleep in

---

[4] Appellant testified that he purchased the soju from a Korean restaurant and explained that soju is a wine with 13% alcohol content.

bed before he ever returned. When she fell asleep, EH was wearing a sports bra, underwear, shorts, and a sleep shirt with a koala on it. She woke up the next morning in entirely different clothes—a different sports bra, pair of underwear, shorts, and shirt—but had no recollection of ever changing clothes. The different shorts and shirt that EH woke up in previously belonged to Appellant's deceased wife. That morning, EH told her female cousin that she was "kind of weirded out because . . . I went to sleep in such and such clothes, and I woke up in those clothes." EH did not, however, tell her cousin about the events of the night before.

### 3. EH's Disclosures

EH did not immediately disclose what Appellant had done. She first made a partial disclosure in August 2022, when she told her mother, JC, that Appellant gave her alcohol to drink. EH told JC about the drinking because she "thought [she] did something wrong for agreeing to drink." JC immediately became angry and upset. EH testified at trial that, during this initial conversation with her mother, she did not tell her mother about any sexually inappropriate behavior. JC reapproached EH later the same day to ask for more details about the drinking. During that second conversation with her mother, EH provided additional details about the "truth or dare" game, including the "dare" to take off her underwear and the "truth" question about pornography.

After EH made the initial disclosure about drinking alcohol and the "truth or dare" game, JC confronted Appellant. Appellant admitted to JC that he did provide alcohol to EH and explained that he breathalyzed EH to "make sure that she wasn't drunk." Appellant also admitted that he did play "truth or dare" with EH, but insisted that "nothing sexual happened." When JC asked why EH woke up in different clothes, Appellant said it was possible EH "could've taken a bath or possibly thrown up on herself."

EH's testimony at trial did not pinpoint exactly when she initially disclosed the first incident that occurred in the spring of 2022 (when she woke up on the couch to Appellant's penis in her hand). EH testified that "one of the first times" she told anyone in detail about the night of the first incident was in September 2022, when she typed a note on a tablet for her stepmother, CH (her biological father's wife), to read. The note reads:

> Things I don't want to speak of but need y'all to no?
>
> [Appellant] got me drunk [redacted text] the next day I was in different clothes like every thing wasn't the same my underwear and bra I took like 12 shots on I couldn't move with out falling over it was like 11pm to i think 1am he asked me if I wanted to play truth or dare and I said I guess and one of the dare's was me to take my underwear off and and truth was what kind of

porn/pron I watch and one time he picked me up and held me in he's arms and then smack my [peach emoji][5] bc I was laughing at my phone and I don't know if it's a dream but he picked up my hand and put he's [eggplant emoji][6] in it and was putting it in and out of my hand but it felt like it was real like I felt it in my hand [redacted text].[7]

(Redacted texts in original).

During her trial testimony, EH explained that she wrote the note on the tablet because it was difficult to talk about and she wanted her stepmother to show the note to her father. EH's stepmother, CH, also testified at trial about the note EH typed on the tablet. CH explained that prior to the note, she kept asking EH if she was alright because EH was "acting a little weird" on their family vacation. Eventually, EH told CH that there was something she needed to talk about without her father around, and she wrote down "what happened" as a note on the tablet. Once EH told CH about what happened with Appellant, CH messaged JC, who told CH that "she already knew."

In November 2022, EH underwent a Child Forensic Interview (CFI). During the CFI, EH initially said she was not sure whether the first incident—when she woke up on the couch with Appellant's penis in her hand—was a vivid dream. At trial, EH was confronted with her prior statement:

> [Senior Defense Counsel (SDC)]. Now thinking back to 2022, when you reported this incident, specifically the penis in the hand incident, you would agree with me that it's completely possible that this could've just been a vivid dream, correct?
>
> [EH]. No.
>
> . . . .
>
> [SDC]. And so, is it your testimony today that this was not a dream?
>
> [EH]. This was -- that was not a dream.
>
> [SDC]. But isn't it true that when you conducted your Child Forensic Interview, in November of 2022, you said that you weren't sure if it was a vivid dream or not?
>
> . . . .

---

[5] EH testified that she meant the peach emoji to represent a "[b]utt."

[6] EH testified that she meant the eggplant emoji to represent a "[p]enis."

[7] Unless otherwise noted, the note is copied verbatim from Prosecution Exhibit 5.

[EH]. Yes, because me and him had I thought the perfect relationship other than those two incidents . . . . But I was hoping that it was a dream.

[SDC]. Okay. And so -- so --

[EH]. -- And it wasn't. It wasn't. I've never had a dream like that.

EH also acknowledged that three years before the first incident occurred with Appellant, "[she] had previously had this happen to [her] by [her] cousin."[8]

## B. Uncharged Offenses of Child Molestation of Other Family Members

At trial, the Government presented evidence that Appellant committed other uncharged offenses of child molestation of other family members, pursuant to Mil. R. Evid. 414 and 404(b).[9]

### 1. SA (Appellant's Stepsister)

Appellant's stepsister, SA, testified about an incident that occurred in 2004, when she was 12 years old, while Appellant was home on leave. SA fell asleep on the couch and woke up to Appellant kneeling down next to her with her "arm stretched out, and his penis was in [her] hand." SA testified she was positive it was Appellant because she opened her eyes and saw him and his penis in her hand. SA pulled her arm in to "avoid it, and tried rolling over to just go back to sleep." She dozed off, but Appellant kept waking her up. At some point, SA told Appellant she did not feel well, and Appellant brought her NyQuil pills to take. SA tried to avoid Appellant by going into her bedroom, but discovered Appellant sitting on her bed. Appellant eventually left her bedroom, and SA was able to shut and lock her bedroom door.

SA did not initially tell anyone what happened with Appellant because she was "afraid that nobody would believe [her]." She testified that she did not confront Appellant, "[o]ut of fear of what would happen." The first time SA told anyone was about 5 years later, when she was 17 years old, when she first told her daughter's father. Other than possibly telling her best friend, SA did not tell anyone else until September 2022, when JC messaged asking to talk. JC asked SA whether "anything weird had ever happened when [SA] was younger," and SA disclosed what had happened with Appellant. At the time of this conversation, SA was not aware of any allegations against Appellant.

---

[8] This cousin was not one of the other children present at the home during the first incident.

[9] On appeal, Appellant does not challenge the admissibility of this evidence.

### 2. HB (Appellant's Daughter)[10]

HB is one of Appellant's daughters.[11] HB testified about an incident that occurred in 2008, when she was 7 years old, where Appellant took HB and her two brothers to a swimming hole at a creek. After a couple of hours of swimming, Appellant told HB and her brothers that it was time to take a nap. Appellant told HB that she had to nap in the front seat of his pickup truck, while HB's brothers napped in the back seat. HB fell asleep and woke up to Appellant's hand between her legs and touching her under her underwear, with his "fingers penetrating [her]." HB was scared and confused. Once Appellant realized she was awake, he "quickly jumped" and "said that he needed to go pee." After this incident, HB's mother took her to seek medical care and the doctors "determined that something had happened," but for reasons HB cannot remember there were no "court proceedings."

## C. Knowledge of the Other Family Members' Allegations

In September 2022, after EH made her initial disclosure about Appellant giving her alcohol and the "truth or dare" game, JC (Appellant's sister/EH's mother) messaged SA to ask if "anything weird had ever happened when [SA] was younger." JC and SA then had a conversation in person during which SA disclosed what Appellant did to her. During her conversation with SA, JC did not bring up "specifics" of what EH had disclosed. JC testified that she never discussed with EH what SA disclosed, but she did share the information with several other family members. JC also testified that, after her conversation with SA, she eventually became "aware of additional sexual misconduct involving [EH] and [Appellant]."

At the time EH initially disclosed to JC that Appellant gave her alcohol, JC was already aware that HB had made allegations of sexual assault against Appellant, but thought that the investigation had been closed. EH also became aware of HB's allegations, although the exact timing is unclear. EH initially testified that she was unsure whether she spoke with HB before EH had her CFI. Later in her testimony, however, EH acknowledged that at the time of her CFI, she was aware of the details of HB's allegations against Appellant.

---

[10] This section discusses HB's testimony about an uncharged incident that occurred when she was 7 years old that was admitted at trial under Mil. R. Evid. 414 and 404(b). HB also testified about a separate incident that occurred when she was 17 years old that formed the basis of the specification for sexual assault in violation of Article 120, UCMJ, *see* n.3 *supra*, for which Appellant was found not guilty.

[11] HB is not the same daughter who was present at Appellant's home at the time of EH's first incident in the springtime of 2022.

EH also acknowledged that since her disclosure she spoke with HB "once or twice" and HB gave her "support and encouragement to report [Appellant]."

## D. Appellant's Testimony

Appellant testified at trial, denying that anything of a sexual nature ever happened with EH, denying ever placing his penis in SA's hand, and denying ever sexually assaulting his daughter HB.

### 1. Convicted Offenses Involving EH

Appellant testified that, prior to EH's allegations, the family—including "the kids"—were aware that Appellant was under investigation for allegations made by his daughter HB. Despite the family's knowledge of the investigation relating to HB, JC's children still regularly stayed at Appellant's house. Appellant and EH had a "good relationship," but Appellant denied that EH was his favorite. He did, however, acknowledge that the other children perceived that he favored EH, and that JC expressed concerns to Appellant about the perceived favoritism because the other children teased EH about it.

Appellant and EH would exchange messages on Facebook Messenger[12] daily or every other day, which was usually initiated by EH. When asked about messages he exchanged with EH, in which he told her "[n]othing will change about how I feel towards you" and "I try to show you that you are loved and you are pretty and you do matter," Appellant explained that telling EH she was pretty was not "sexual" but was in response to her brother always calling her names.

With respect to the first incident EH testified to—when she woke up on the couch to Appellant's penis in her hand—Appellant testified there was no truth to the allegation, that when he first learned of the allegation he had no idea what she was talking about, and that there has never been a time that he sexually abused EH. Appellant did admit that he frequently gave "the kids" sleeping aids such as melatonin pills or melatonin gummies.

With respect to the second incident EH testified to—when Appellant gave her alcohol and they played "truth or dare"—Appellant corroborated many of the events of that night but with materially different details. Appellant testified that EH asked to try soju. According to Appellant, he and JC had an agreement that the children could drink alcohol in "limited amounts."[13] Appellant estimated that he provided EH in total about half a cup of "straight or pure"

---

[12] Appellant explained that the farm did not have cell phone service, and Facebook Messenger was a simple application to use on a wireless network.

[13] In the Government's rebuttal case, JC testified that she never had an agreement with Appellant that EH was allowed to drink alcohol.

soju, but diluted it with ginger ale and provided it to her in about six shot glasses over about an hour-and-a-half to two hours.[14] To ensure that EH did not become "intoxicated," Appellant used a breathalyzer on EH two or three times. The highest reading Appellant observed on the breathalyzer was ".06." At that point, Appellant told EH she was done drinking because "that was too close to being 0.08, the legal limit." Appellant testified that he did not ever observe signs of intoxication from EH.

After Appellant "cut [EH] off from drinking," EH went back to playing on her virtual reality headset "for a little bit," watched television, and hung out. When Appellant later checked on EH, she complained that she was "bored" and wanted to play the game *Cards Against Humanity*.[15] Appellant told EH it would be boring to play *Cards Against Humanity* with only two people, and then EH said she wanted to play a game of "truth or dare."

When asked about EH's testimony that he "dared" her to remove her shorts and underwear and put back on her shorts with no underwear, Appellant denied that the dare had anything to do with "taking off underwear." Instead, Appellant testified he dared EH to "[t]ake a pair of [her] underwear and put them on over [her] shorts." Appellant explained that EH was into "cosplay" and he "was trying to be supportive of her hobbies." He elaborated that he "thought it would be cute . . . [like] the Superman look, inside out . . . [or like] SpongeBob had one of those where he did an inside out day." Appellant denied that he was trying to arouse his sexual desires and instead maintained "[i]t was just supportive fun, like ha ha." Appellant did, however, admit that in daring EH to put a pair of her underwear over her shorts he "didn't clarify that it wasn't the pair that she was wearing." Appellant testified that EH said she did not want to do the dare.

When asked about the "truth" EH testified to—where Appellant asked her what type of pornography she watches—Appellant denied asking that as a "truth" during the game, but did admit to asking that question in a different context. Appellant explained that they were discussing that EH's brother and male cousin had been "caught" with pornography and EH was "making fun of

---

[14] Although Appellant admitted to giving alcohol to EH, the military judge found him not guilty of the Article 134, UCMJ, offense of unlawfully giving alcohol to a child under 18 years. The military judge took judicial notice of an Illinois criminal statute that the Defense argued allowed persons standing in *loco parentis* to provide alcohol to a person under 21 years of age in the privacy of a home.

[15] Appellant testified that *Cards Against Humanity* is a game that discusses topics such as ejaculation, penises, vaginas, and rape. However, Appellant did not consider the game to be a "sexual game" and said that the family often played the game together.

them for having some sort of weird porn." Appellant's response was to ask EH, "well, what kind of weird porn do you watch," as a way to teach her "don't throw stones, like, don't make fun of them whenever, you know, you do the same thing." Appellant testified, "There was nothing sexual or gratifying about that."

### 2. Uncharged Offenses Involving SA and HB

Appellant recalls the night SA, his stepsister, testified about the sexual abuse incident, but denies ever putting his penis in SA's hand while she was sleeping on the couch or ever making "sexual" contact with SA. According to Appellant, SA was on the couch and he was talking to her "about the complete dysfunction of the family." While he was talking to SA, she stretched out on the couch and kicked Appellant. That was the only "physical interaction" that they had on the couch, and it was not sexual in nature. Appellant testified that he first learned of SA's allegations after EH disclosed to her mother, JC, that Appellant gave her alcohol.

Appellant also recalls taking HB and her brothers to the swimming hole at the creek, when HB was 7 years old. Appellant drove the children in his truck and was the only adult present. The children swam for "a couple of hours" and became tired. On the drive back to the farm, HB fell asleep in the front seat of Appellant's truck, while the two boys fell asleep in the back. Once they got back to the farm, the children "woke up and continued playing." Appellant denied ever sexually assaulting HB. Appellant testified that he became aware that HB complained of vaginal discomfort after the day at the swimming hole. HB underwent a medical examination, which determined that she had a yeast infection.

### E. Expert in Forensic Psychology

The Defense also presented the testimony of Dr. WJ, an expert in the field of forensic psychology. Dr. WJ explained the concept of "false memories" in which a person genuinely believes an event or details of an event to be true when it did not actually occur. "Suggestibility" puts a person at risk for a false memory. Children aged 3 to 6 years old are most susceptible to suggestibility; while all children are at risk for suggestibility, older children "have developed stronger cognitive skills and abilities." An authority figure "can further put [children] at risk for suggestibility."

Dr. WJ opined that, based upon reviewing EH's CFI and observing her trial testimony, multiple risk factors for suggestibility were present. The CFI occurred approximately two-and-a-half months after the "initial outcry of an allegation of sexual abuse," which put EH at risk for suggestibility from family members in the intervening time. Dr. WJ explained that the "neutral interview" should have happened "shortly after, as quickly as possible," and that

the more time that passes the child will be exposed to more risk factors for suggestibility.

Dr. WJ also testified that EH was subject to repetitive questioning from family members, which is another risk factor for suggestibility. Moreover, because EH reported to family members with their own history of sexual abuse, it created a risk of confirmation bias in which those family members ask questions to confirm their pre-existing belief that something in fact must have occurred. Additionally, EH's own prior experience of sexual abuse three years earlier created a risk of "an alternate source of knowledge." Dr. WJ also testified that the negative stereotyping of Appellant and EH's initial statement that she was not sure whether it was a vivid dream are further risk factors of suggestibility.

On cross-examination, Dr. WJ testified that salient memories, such as experiencing a sexual assault, are more strongly encoded in a person's memory. Dr. WJ agreed that children under 5 years old are at the highest risk for suggestibility, and that the presence of a positive relationship reduces the risk of suggestibility. Moreover, the presence of a risk factor does not mean that the risk factor had an effect. Factors that decrease the risk of suggestibility include consistency of the memories that are recalled and a spontaneous statement made by a child in "language that was akin to a child." Dr. WJ agreed that incremental disclosures—in which the person initially gives some details, but then provides additional details upon further questioning—is a common observance, especially with children. An incremental disclosure does not, by itself, mean that a memory is a false memory. Dr. WJ also agreed that dreams typically "don't have a logical flow to them" and are "kind of random . . . all over the place." Moreover, "typically a person would not recall a sensory detail of an experience, if that experience was a dream."

## II. DISCUSSION

On appeal, Appellant challenges the factual sufficiency of his convictions. Appellant also challenges the legal sufficiency of the specification charging indecent "conduct" by daring EH to take her pants and underwear off, where the "actus reus exclusively involved language."

### A. Factual Sufficiency

#### 1. Law

We are neither required nor empowered to review the factual sufficiency of the evidence unless an appellant both (1) asserts an assignment of error and (2) shows a specific deficiency in the proof. *United States v. Harvey*, 85 M.J. 127, 130 (C.A.A.F. 2024). The current version of Article 66(d)(1)(B), UCMJ, FACTUAL SUFFICIENCY REVIEW, provides:

(i) In an appeal of a finding of guilty under subsection (b), the Court may consider whether the finding is correct in fact upon request of the accused if the accused makes a specific showing of a deficiency in proof.

(ii) After an accused has made such a showing, the Court may weigh the evidence and determine controverted questions of fact subject to—

(I) appropriate deference to the fact that the trial court saw and heard the witnesses and other evidence; and

(II) appropriate deference to findings of fact entered into the record by the military judge.

(iii) If, as a result of the review conducted under clause (ii), the Court is clearly convinced that the finding of guilty was against the weight of the evidence, the Court may dismiss, set aside, or modify the finding, or affirm a lesser finding.

10 U.S.C. § 866(d)(1)(B), *Manual for Courts-Martial, United States* (2024 ed.) (2024 *MCM*).

"[T]he requirement of 'appropriate deference' when a [Court of Criminal Appeals (CCA)] 'weigh[s] the evidence and determine[s] controverted questions of fact' . . . depend[s] on the nature of the evidence at issue." *Harvey*, 85 M.J. at 130 (third and fourth alterations in original). It is within this court's discretion to determine what level of deference is appropriate. *Id.* at 131.

"[T]he quantum of proof necessary to sustain a finding of guilty during a factual sufficiency review is proof beyond a reasonable doubt, the same as the quantum of proof necessary to find an accused guilty at trial." *Id.* at 131 (internal quotation marks omitted). For this court "to be 'clearly convinced that the finding of guilty was against the weight of the evidence,' two requirements must be met." *Id.* at 132. First, we must decide that evidence, as we weigh it, "does not prove that the appellant is guilty beyond a reasonable doubt." *Id.* Second, we "must be clearly convinced of the correctness of this decision." *Id.*

**2. Analysis**

***a. Specification 1 of Charge I - Causing EH to Touch Appellant's Penis***

In order to convict Appellant of Specification 1 of Charge I, the Government was required to prove: (1) Appellant committed a lewd act upon EH, by causing EH to touch his penis with her hand; (2) Appellant did so with the intent to gratify his sexual desires; and (3) EH was a child who had not attained the age of 16 years. *See Manual for Courts-Martial, United States* (2019 ed.) (*MCM*),

pt. IV, ¶ 62.b.(3); *see also MCM*, pt. IV, ¶ 62.a.(h)(5) (defining "lewd act"); *MCM*, pt. IV, ¶ 62.a.(h)(4) (defining "child"). Appellant contends the Government failed to prove beyond a reasonable doubt that the lewd act occurred or, if it did, that Appellant was the one who committed it. He presents several arguments in support of this contention, which we find to be a sufficiently "specific showing of a deficiency in proof" to empower this court to review the factual sufficiency. *See* Article 66(d)(1)(B)(i), UCMJ.

First, Appellant points to EH's statements, made in the note typed on the tablet and initially during the CFI, that she was unsure whether the incident was a vivid dream. Appellant contends that because he gave EH sleep aids prior to the incident, and because she was the victim of a prior similar assault by her cousin, it increased the possibility that she was recalling a dream because "[d]reams, of course, are a reflection of past experiences." We are unpersuaded. While we acknowledge that the defense expert testified that EH's initial statements that she was unsure whether the incident was a dream increased her risk for suggestibility, EH was clear and firm in her testimony at trial that she knew the incident was not a dream. EH explained her prior statements questioning whether it was a dream as a coping mechanism in that she was "hoping that it was a dream." We find it perfectly reasonable that a child who looks up to their uncle would not want to believe that he sexually abused her.

Moreover, EH described in graphic detail what she felt and heard upon waking up to Appellant's penis in her hand—explaining that the penis felt "like a bone with like skin on it," describing the sensation of "back and forth" movement, feeling Appellant's "calcified, like dry" hands rearranging her fingertips to "curl them back" into a closed hand around his penis, and the sound of Appellant's "heavy breathing" just like how he sounds after screaming during a game or when he drinks. The defense expert, Dr. WJ, agreed that "typically a person would not recall a sensory detail of an experience, if that experience was a dream." Furthermore, the logical flow of EH's recollection weighs against finding it was only a dream because, as Dr. WJ agreed, dreams typically "don't have a logical flow to them" and are "kind of random . . . all over the place." While Dr. WJ did testify that EH's prior experience of sexual abuse three years earlier created a risk of "an alternate source of knowledge," she did not indicate that it created a risk of a false memory based upon a dream. Additionally, there is no support for Appellant's assertion that the sleeping aids made it more likely that EH had a dream that created a false memory, nor is there any support for Appellant's assertion that "[d]reams, of course, are a reflection of past experiences."

Next, Appellant cites to evidence that EH never actually saw Appellant commit the charged act and that there were "several of the male children" in

the house at the time. EH testified that while she "fluttered" her eyes, she did not open her eyes because she was scared. While visual identification may be a more reliable identifier, we are nonetheless persuaded by EH's ability to identify Appellant (who she frequently spent time with) by his "calcified, like dry" hands and the familiar sound of his heavy breathing. Just prior to falling asleep on the couch, Appellant gave EH "sleep aids" and was watching a movie with her. We find EH's description of the penis—"like a bone with like skin on it"—as more consistent with an adult male's penis than that of the only two other males present in the home, EH's 13-year-old brother and her 10-year-old male cousin. Furthermore, we find the evidence of the strikingly similar incident involving SA lends additional weight to the identity of Appellant.

Appellant also cites to what he characterizes as "crosstalk" between various family members and contends that it was only after SA shared her allegation with EH's mother, JC, that "EH then alleged the exact same thing." The trial testimony does establish that JC learned of SA's allegation in September 2022. However, JC testified that she never discussed SA's allegation with EH, although she did share the information with other family members. At trial, EH was not asked whether she was aware of SA's allegation. Mere speculation that EH may have been aware of SA's allegation, because JC and other family members knew, is not persuasive. Moreover, even if we were to assume that EH was aware of SA's allegation, we do not find any basis to believe that EH fabricated her allegation on the basis of SA's allegation. While the allegations are strikingly similar in the respect that Appellant placed his penis in each child's sleeping hand, the similarity is just as likely to show Appellant's motive, intent, or plan.

In support of his argument, Appellant points to the fact that EH only disclosed that Appellant gave her alcohol in her initial disclosure to JC in August 2022 and, at that time, did not disclose the first incident of waking up to Appellant's penis in her hand. We do not, however, find EH's partial disclosure to raise a reasonable doubt. Dr. WJ agreed that the doctrine of incremental disclosure is a common observance in psychology, especially with children, and that an incremental disclosure does not, by itself, mean that a memory is a false memory.

Finally, Appellant points to Dr. WJ's testimony that EH presented multiple risk factors for suggestibility or false memory. Dr. WJ testified that EH's initial statement that she was unsure whether it was a vivid dream, the passage of two-and-a-half months between EH's initial disclosure and the CFI, repetitive questioning, potential for confirmation bias, EH's prior experience of sexual abuse, and negative stereotyping of Appellant, were all risk factors for suggestibility and a false memory. However, Dr. WJ also agreed that countervailing indications existed weighing against the risk of suggestibility such as EH's age,

consistency of the memory recalled, spontaneous statement made in "language that was akin to a child," and positive relationship with Appellant. Moreover, Dr. WJ agreed that the presence of a risk factor does not mean that the risk factor had an effect.

Appellant's argument does not contest that EH's testimony, if true, is factually sufficient to sustain his conviction for this offense. In assessing EH's credibility, we are persuaded for several reasons. First, we find persuasive EH's graphic detail of the sensations she felt—"like a bone with like skin on it," "back and forth" movement, Appellant's "calcified, like dry" hands, and the sound of Appellant's "heavy breathing." We also note the corroborating evidence that EH suddenly no longer wanted to go to her "fun uncle's" house, which is evidenced by the text messages in which EH responded to Appellant's repeated requests that she come to his house by stating that she "did not want to." Both EH's mother, JC, and her stepmother, CH, noticed a change in EH's demeanor in which she no longer wanted to go to Appellant's house, seemed "reclused," and was "acting a little weird." We are also persuaded by EH's spontaneous disclosure in "language that was akin to a child" by typing on the tablet that "he picked up my hand and put he's [eggplant emoji] in it and was putting it in and out of my hand but it felt like it was real like I felt it in my hand." Moreover, we find Appellant's strikingly similar past molestation of his sleeping 12-year-old stepsister SA, as well as his past molestation of his sleeping 7-year-old daughter HB, to be strong propensity evidence. *See United States v. Fetrow*, 76 M.J. 181, 188 (C.A.A.F. 2017) ("The very nature of propensity evidence is to permit the trier of fact to infer that since the accused has acted previously in a certain fashion, he was inclined to have acted in conformity with that conduct with respect to the charged offenses.").

The military judge, unlike this court, had the opportunity to observe the demeanor of both EH and Appellant in their testimony and to assess their credibility firsthand. In finding Appellant guilty, the military judge evidently found EH sufficiently credible. We find it appropriate to give substantial deference to the military judge's determination of credibility, *Harvey*, 85 M.J. at 130, and we ourselves are not clearly convinced that the finding of guilty was against the weight of the evidence, Article 66(d)(1)(B), UCMJ (2024 *MCM*).

### b. Specifications 3 and 4 of Charge I – "Truth or Dare" Game

Appellant argues that his own testimony at trial presented "a perfectly plausible account in the context of a game of truth or dare and would clearly not constitute a lewd act." In support of this argument, he contends EH's perception of the events "could have resulted from a misunderstanding due to her alcohol consumption and . . . her exposure to multiple family members talking negatively about [Appellant]." We find Appellant's arguments to be a sufficiently "specific showing of a deficiency in proof" to empower this court to

review the factual sufficiency. *See* Article 66(d)(1)(B)(i), UCMJ. Nonetheless, we are unpersuaded.

### i) Specification 3 of Charge I – the Dare

In order to convict Appellant of Specification 3 of Charge I, the Government was required to prove: (1) Appellant committed a lewd act upon EH, by engaging in indecent conduct, to wit: daring EH to take her pants and underwear off; (2) which was intentionally done in the presence of EH; (3) which conduct amounted to a form of immorality relating to sexual impurity which is grossly vulgar, obscene, and repugnant to common society and tends to excite sexual desire or deprave morals with respect to sexual relations; and (4) EH was a child who had not attained the age of 16 years. *See MCM*, pt. IV, ¶ 62.b.(3); *see also MCM*, pt. IV, ¶ 62.a.(h)(5)(D) (defining "lewd act"); *MCM*, pt. IV, ¶ 62.a.(h)(4) (defining "child").

In his own testimony, Appellant admits he provided numerous "shots" of alcohol to EH and then played a game of "truth or dare" with her. He also admits that, during the game, he dared EH to do something that involved her underwear, but claims a different version of the "dare." EH testified that Appellant dared her "to take off your underwear but you can put your shorts back on when you're done taking them off." The dare made EH "uncomfortable" and she refused to do it. EH testified that Appellant sounded disappointed when she refused. Appellant testified to a different version, claiming he did not dare her to take off her underwear, but rather dared her to put a pair of underwear on over her shorts. In his testimony, Appellant contended the dare was not for his sexual gratification but was simply to be "cute" and "fun." Under EH's version of the "dare," we have no reasonable doubt that an uncle daring his 12-year-old niece to take off her underwear is a lewd act.

We are not persuaded by Appellant's argument that EH misunderstood the dare due to her alcohol consumption or was biased by the negative stereotyping of Appellant by other family members. EH testified to her detailed recollection of the night, including a description of the soju—how it tasted "[l]ike rubbing alcohol" and "burnt [her] entire mouth"—and how many "shots" Appellant poured, which was generally consistent with Appellant's own testimony. Both Appellant and EH testified that the highest breathalyzer reading was .06, which Appellant described as "less than the legal limit" for intoxication, albeit for an adult. Moreover, Appellant testified that EH did not show signs of intoxication. EH did not indicate any inability to recall in her testimony, and in fact testified to the specific wording of the "dare." Finally, there was no direct evidence that EH was aware of the other family members' allegations at the time of the "truth or dare" game or at the time of her disclosure to her mother, JC.

With conflicting testimony between EH and Appellant, the military judge had to make a credibility determination between EH's version of the dare and Appellant's version of the dare. In our review, we find EH's version more credible, particularly in light of the surrounding circumstances in which Appellant first plied EH with numerous shots of soju, which he mixed with ginger ale to make it "easier" for her to keep drinking. Applying appropriate deference to the military judge, who assessed witness credibility firsthand, we are not clearly convinced that the finding of guilty was against the weight of the evidence.

### ii) Specification 4 of Charge I – the Truth

In order to convict Appellant of Specification 4 of Charge I, the Government was required to prove: (1) Appellant committed a lewd act upon EH, by intentionally communicating indecent language to her, to wit: asking what kind of pornography she watches; (2) with an intent to gratify his sexual desires; and (3) EH was a child who had not attained the age of 16 years. *See MCM*, pt. IV, ¶ 62.b.(3); *see also MCM*, pt. IV, ¶ 62.a.(h)(5)(C) (defining "lewd act"); *MCM*, pt. IV, ¶ 62.a.(h)(4) (defining "child").

Appellant admits that he indeed asked EH what kind of pornography she watches. However, Appellant claims that the question was not part of the "truth or dare" game but rather came up in a "wholly different context" when EH was making fun of her brother and cousin who had been caught watching "weird porn." According to Appellant's testimony, he was teaching EH, "don't throw stones, like, don't make fun of them whenever, you know, you do the same thing." On appeal, Appellant argues, "there was nothing inherently improbable in [his] story." Even under Appellant's "story," we have no reasonable doubt that asking his 12-year-old niece what kind of pornography she watches was indecent language with the intent to satisfy his sexual desires.

## B. Legal Sufficiency of Specification 3 of Charge I – the Dare

For the first time on appeal, Appellant contends that Specification 3 of Charge I is legally insufficient because it charges indecent *conduct* based on communication of indecent *language*, which Appellant contends is a separate theory of criminal liability for a lewd act.

### 1. Law

"In most legal sufficiency cases, which we review de novo, the [c]ourt asks whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Mendoza*, 85 M.J. 213, 217 (C.A.A.F. 2024) (internal quotation marks and citation omitted). The court draws every reasonable inference from the evidence in favor of the prosecution, thus "[t]he standard for legal sufficiency involves a very low threshold to

sustain a conviction." *United States v. King*, 78 M.J. 218, 221 (C.A.A.F. 2019) (alteration in original) (internal quotation marks and citation omitted).

But, as in *Mendoza*, "[t]his case . . . departs from the usual 'reasonable trier of fact' analysis because [the a]ppellant challenges the legal sufficiency of his . . . conviction on . . . unusual grounds." 85 M.J. at 217. Like *Mendoza*, Appellant "argues that his conviction was legally insufficient . . . by conflating two different theories of criminal liability . . . ." *Id.* This is a question of statutory interpretation, which the court reviews de novo. *Id.* at 218.

> The first step in statutory interpretation cases is to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case. [I]f the statutory language is unambiguous and the statutory scheme is coherent and consistent, the inquiry is done. Whether the statutory language is ambiguous is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole.
>
> When we engage in this analysis, the [c]ourt typically seeks to harmonize independent provisions of a statute. To this end, this [c]ourt employs the surplusage canon, which requires that, if possible, every word and every provision is to be given effect and that no word should be ignored or needlessly be given an interpretation that causes it to duplicate another provision or to have no consequences.

*Id.* (first alteration in original) (citation modified).

The relevant statute at 10 U.S.C. § 920b provides:

> (c) SEXUAL ABUSE OF A CHILD.—Any person subject to this chapter who commits a lewd act upon a child is guilty of sexual abuse of a child and shall be punished as a court-martial may direct.
>
> . . . .
>
> (h)(5) LEWD ACT.—The term "lewd act" means—
>
>> (A) any sexual contact with a child;
>>
>> (B) intentionally exposing one's genitalia, anus, buttocks, or female areola or nipple to a child by any means, including via any communication technology, with an intent to abuse, humiliate, or degrade any person, or to arouse or gratify the sexual desire of any person;

19

(C) intentionally communicating indecent language to a child by any means, including via any communication technology, with an intent to abuse, humiliate, or degrade any person, or to arouse or gratify the sexual desire of any person; or

(D) any indecent conduct, intentionally done with or in the presence of a child, including via any communication technology, that amounts to a form of immorality relating to sexual impurity which is grossly vulgar, obscene, and repugnant to common propriety, and tends to excite sexual desire or deprave morals with respect to sexual relations.

In their arguments, both parties rely heavily on our superior court's opinion in *United States v. King*, 71 M.J. 50 (C.A.A.F. 2012), which predates Article 120b, UCMJ. In *King*, the court reviewed the legal sufficiency of a specification of an indecent act under Article 120(k), UCMJ, *Manual for Courts-Martial, United States* (2008 ed.) (2008 *MCM*). *Id.* The specification at issue in *King* alleged that the accused engaged in an indecent act by requesting that his stepdaughter expose her breasts so that he could view them on a web camera. *Id.* at 51. At the time, Article 120(k), UCMJ, provided that any person who engaged in "indecent conduct" is guilty of an indecent act. 2008 *MCM*, pt. IV, ¶ 45.a.(k). "Indecent conduct," in turn, was defined in part as "that form of immorality relating to sexual impurity which is grossly vulgar, obscene, and repugnant to common propriety, and tends to excite sexual desire or deprave morals with respect to sexual relations." 2008 *MCM*, pt. IV, ¶ 45.a.(t)(12). At the time, indecent liberty with a child was also an offense under Article 120(j), UCMJ. 2008 *MCM*, pt. IV, ¶ 45.a.(j). "Indecent liberty" was defined as "indecent conduct, but physical contact is not required. . . . [It] may consist of communication of indecent language as long as the communication is made in the physical presence of the child." 2008 *MCM*, pt. IV, ¶ 45.a.(t)(11).

On appeal, King challenged the legal sufficiency of the specification charging an indecent act. *King*, 71 M.J. at 50. "[T]he crux of King's argument [was] that asking his fourteen-year-old stepdaughter to lift her shirt so that he could see her breasts constituted 'indecent language' and 'indecent language' is not included under the definition of 'indecent conduct.'" *Id.* at 52. The United States Court of Appeals for the Armed Forces (CAAF) noted that "this court has held that 'language' can be, or be part of, 'conduct' in a particular case." *Id.* at 52 n.3 (citing *United States v. Brinson*, 49 M.J. 360, 364−65 (C.A.A.F. 1998)) (concluding that use of coarse language constituted disorderly conduct); *United States v. Littlewood*, 53 M.J. 349, 352, 353−54 (C.A.A.F. 2000) (finding a variety of offenses, including indecent language, to be indecent conduct of a nature to bring discredit upon the armed forces and prejudicial to good order and discipline); *United States v. Lofton*, 69 M.J. 386, 390 (C.A.A.F. 2011) (holding that

sexual comments made by an officer to a female enlisted Airman constituted conduct unbecoming an officer). The court, however, found it "unnecessary to address the . . . issue" of whether the language charged could be "conduct" because it concluded that "at a minimum, the facts support an attempted indecent act." *Id.* at 52–53. In reaching that conclusion, the court reasoned that "King's request was an 'overt act' that constituted 'direct movement toward the commission' of an indecent act. But for his stepdaughter's refusal to lift her shirt, King would have 'view[ed]' his stepdaughter's breasts using the webcam." *Id.* at 52 (alteration in original).

A panel of this court followed *King,* 71 M.J. 50, in considering a similar specification under Article 120(k), UCMJ (2008 *MCM*), where the accused requested a 13-year-old girl send him an image of her breasts. *United States v. Capps*, No. ACM 38160, 2013 CCA LEXIS 842, at *13 (A.F. Ct. Crim. App. 9 Oct. 2013) (unpub. op.). The court noted, "*King* does not stand for the proposition that a request to view a young teenager's breasts via electronic means can *never* constitute a completed indecent act." *Id.* at *13. However, like the CAAF in *King*, the court nonetheless did "not find it necessary to hold that the appellant completed an indecent act" because "[c]onsistent with our superior court's example, we affirm the lesser included offense of an attempted indecent act, which does not change the sentencing landscape." *Id.*

### 2. Analysis

In relevant part, Specification 3 of Charge I alleges that Appellant committed a lewd act upon EH "by engaging in indecent *conduct*, to wit: *daring* EH to take her pants and underwear off, intentionally done in the presence of EH . . . ." (Emphasis added). Appellant argues that, under the precedent of *King*, the "dare" charged in the specification is "language" and "not conduct itself." According to Appellant, interpreting "conduct" to include language "would render an entire statutory provision superfluous" because the statute "clearly delineates indecent language from indecent conduct." Appellant contends that the misconduct charged in the specification "would be at most an *attempt* to engage in indecent conduct," but unlike *King*, "no lesser included offense is available based on the charging language."[16] The Government counters that, as a panel of this court found in *Capps*, unpub. op. at *13, "*King* does not stand for the proposition that a request . . . can never constitute a completed indecent act." The Government urges this court to find that the "dare" was "conduct" that was a completed offense the moment Appellant communicated his request

---

[16] Nonetheless, Appellant does concede that "affirming [a lesser included offense] of attempt would not result in a reduction of sentence."

to EH. In the alternative, the Government requests that we affirm a lesser included offense of "an attempted lewd act via indecent conduct."

We agree with the Government that "at a minimum" we could affirm the lesser included offense of attempt—under the theory that the "dare" was attempted indecent conduct because, but for EH's refusal, Appellant would have seen EH take off her pants and underwear—in line with *King*, 71 M.J. 50, and *Capps*, unpub. op. We also agree with the Government, and as Appellant concedes, that affirming the lesser included offense of attempt would not change the sentencing landscape. However, we find it unnecessary to affirm the lesser included offense of attempt, because we find the specification alleges *completed* indecent conduct—the act of the verbal request itself.

Because the CAAF ultimately found it "unnecessary to address the . . . issue" of whether the language charged in *King* (requesting that his stepdaughter expose her breasts so that he could view them on a web camera) could be "conduct," it does not squarely answer the question before us. We disagree with Appellant's argument that the "dare" charged in the specification could not be "conduct itself." As instructed in *Mendoza*, "our analysis begins, as it must, with the text of the statute." 85 M.J. at 219. The language of subsection (h)(5)(D) of 10 U.S.C. § 920b does not expressly foreclose the Government from proving that Appellant engaged in "conduct" by the act of making a verbal request. Indeed, subsection (h)(5)(D) includes *"any"* indecent conduct. Looking beyond the specific statutory language and examining "the specific context in which that language is used, and the broader context of the statute as whole," *Mendoza*, 85 M.J. at 218, we believe that Appellant reads subsection (h)(5)(D) too narrowly in excluding the possibility that language may be conduct in a particular case.

The common understanding of "conduct" includes verbal acts. *See Conduct,* BLACK'S LAW DICTIONARY (12th ed. 2024) (defining "conduct" as "[p]ersonal behavior, whether by action of inaction, *verbal* or nonverbal; the manner in which a person behaves; collectively, a person's deeds" (emphasis added)). In line with this common understanding, the CAAF "has held that 'language' can be, or be part of, 'conduct' in a particular case." *King*, 71 M.J. at 52 (citations omitted). We find that the verbal request as charged in the specification amounts to conduct within its common meaning. In making this determination, we heed the CAAF's admonition that "context matters" when evaluating language. *United States v. Avery*, 79 M.J. 363, 369 (C.A.A.F. 2020) (citing *United States v. Green*, 68 M.J. 266, 270 (C.A.A.F. 2010)). The specification does not merely charge language, but instead charges the "dare," which is the verbal act of a

challenge.[17] In making the "dare," Appellant was not merely communicating language but rather was actively engaging in "conduct" by making a verbal request to EH to take her shorts and underwear off. In other words, the gravamen of the offense is the act of the verbal request itself (*daring* EH to take off her pants and underwear), not the indecency of the language (pants and underwear). Appellant completed his "conduct" by making the verbal request itself. The fact that EH did not comply with the request does not negate the "conduct" of the request itself.

We also disagree with Appellant's contention that by finding certain "language" in a particular context to be "conduct" we render subsection (h)(5)(C) of 10 U.S.C. § 920b (indecent language) surplusage. While "'language' can be, or be part of, 'conduct' in a particular case," *King*, 71 M.J. at 52, not all language itself is conduct. For example, language communicating a desire, thought, or an observation is unlikely to be conduct. By finding some language—such as the verbal request for EH to take off her pants and underwear—to be conduct does not render subsection (h)(5)(C) "practically devoid of significance" or "relegat[ed] . . . to mere surplusage without any purpose or effect." *Mendoza*, 85 M.J. at 220 (citation omitted).

### III. CONCLUSION

The findings as entered are correct in law and fact. Article 66(d)(1), UCMJ, 10 U.S.C. § 866(d)(1) (2024 *MCM*). In addition, the sentence as entered is correct in law and fact, and no error prejudicial to the substantial rights of the appellant occurred. Articles 59(a) and 66(d), UCMJ, 10 U.S.C. §§ 859(a), 866(d). Accordingly, the findings and sentence are **AFFIRMED**.



FOR THE COURT

CAROL K. JOYCE
Clerk of the Court

---

[17] The definition of "dare" is "to challenge to perform an action esp[ecially] as a proof of courage." *Dare*, MERRIAM WEBSTER'S COLLEGIATE DICTIONARY (10th ed. 1996).